**▶ 12 4883 BPG** *thru* **▶ 12 4887 BPG**

## AFFIDAVIT OF TASK FORCE OFFICER CRAIG JESTER

Your affiant, Task Force Officer Craig Jester, being duly sworn, does depose and state the following:

1. I am a Detective with the Baltimore Police Department and have been so employed since 2001. I have been deputized as a Task Force Officer with the DEA for approximately one year. I am currently assigned to the DEA's Special Investigations Group (DEA SIG), which investigates large-scale narcotics trafficking organizations in the Baltimore area. During my time as a law enforcement officer, I have participated in numerous investigations of unlawful drug distribution involving the use of confidential informants, undercover transactions, physical and electronic surveillance, telephone toll analysis, investigative interviews, the execution of search warrants, and the recovery of substantial quantities of narcotics, narcotics proceeds, and narcotics paraphernalia. I have reviewed taped conversations, as well as documents and other records relating to narcotics trafficking and money laundering. I have examined records consisting in part of buyers and seller's lists, and pay/owe ledgers. I have interviewed drug dealers, users and confidential informants and have discussed with them the lifestyles, appearance and habits of drug dealers and users.

2. Through training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the possession and use of firearms in connection with trafficking of such drugs, and the methods by which narcotics traffickers collect, store and conceal the proceeds of their illegal activities. I have also become familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded communications or slang-filled telephone conversations, false or

■ 12 4883 BPG  *thru*  ■ 12 4887 BPG

fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

3.  This Affidavit is made for the limited purpose of establishing probable cause in support of Criminal Complaints alleging that SEAN THORNTON, RODNEY PROCTOR, ANTONIO DAVIS, MICHAEL JOHNSON and JAZMEN TRUSTY aka "TYRONE BROWN" (the "Target Subjects"), each: (a) conspired to possess with the intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846; and (b) conspired to possess firearms in furtherance of their drug conspiracy, in violation of 18 U.S.C.§ 924 (o). Because this Affidavit is offered for the limited purpose of establishing probable cause to support the Criminal Complaints, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the entities, individuals, and the events described in this Affidavit.

4.  The statements made in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided to me by other law enforcement officers; (c) information provided to me and other law enforcement officers by confidential sources of information; (d) review of consensually monitored and/or recorded conversations; (e) criminal history records maintained by various law enforcement agencies, the Baltimore Police Department ("BPD") and the National Criminal Information Center ("NCIC");
and (f) the training and experience of myself and other law enforcement agents and officers.

5.  To the extent that consensually recorded communications are summarized below, those summaries do not include references to all of the topics covered during the course of the conversation that was recorded. In addition, the summaries do not include references to all statements made by the speakers on the topics that are described. All quotations from recorded conversations are based upon preliminary transcriptions of those conversations and/or from your

M-12 4883 BPG thru M-12 4887 BPG

Affiant having personally listened to the recordings. In addition, the participants in many of these communications involved the use of slang terms and code words. Those code words and slang terms, as well as communications in general, are analyzed to their meaning in this Affidavit based upon information from (a) confidential sources of information, (b) my training, experience and knowledge of this investigation, (c) other law enforcement officers' training, experience and knowledge of this investigation, and (d) other evidence gathered during the course of the investigation, such as physical surveillance.

6. Part of the information contained in this affidavit is based on information provided by confidential sources of information, hereinafter CS-6 and CS-8. CS-6 has been providing information to law enforcement for at least one year, and has made controlled purchased of narcotics, which has led to the seizure of drugs, money, and firearms. CS-6 is being paid for his/her cooperation and for consideration in pending criminal charges. CS-6's information has been corroborated to the extent possible and has been determined to be accurate and reliable. CS-6 has prior convictions for drug trafficking and for attempted murder. CS-8 has been providing information to the DEA for several years and is being paid for his/her services. CS-8 has participated in other DEA operations that have resulted in the conviction of several violent drug traffickers. CS-8's information has proven reliable in the past.

7. In the Fall of 2012, the DEA received information from the BPD and CS-6 that DAVIS, PROCTOR, and THORNTON are armed drug traffickers and members of the Black Guerilla Family ("BGF") street gang, who are active in the Penrose neighborhood of Baltimore City, Maryland.

■ ¹² **12  4883 BPG** *thru* ■ ¹² **12  4887 BPG**

8.      On or about December 12, 2012, at the direction of law enforcement, CS-8 met with DAVIS, PROCTOR, THORNTON and JOHNSON, at a location in Baltimore City. This meeting was recorded via a hidden audio device and surveilled by law enforcement officers.

9.      During the meeting, CS-8 explained to the group that he was a drug trafficker who was interested in robbing his (CS-8's) source of supply of narcotics when the source travelled to Baltimore City. CS-8 told the group, "My man [source of supply] coming...he gonna have some shit [drugs] with him...I need someone to take him off when he come down here [rob him]." CS-8 offered to split the stolen narcotics with whoever helped him to commit the robbery. CS-8 said, "whatever he bring, we split...he bring six jaunts [kilograms], y'all get three, I get three, if he bring ten, you get five, I get five." CS-8 explained, "...all we gotta do, he come down here, I go in with my little cheddar [money], like I'm gonna buy some shit [drugs] – he gonna give me some shit [drugs] anyway. A TARGET SUBJECT then responded, "Right." CS-8 continued, "All you gotta do is come in behind me, whop, whop, whop, we collect 'em, we wrap 'em up, we outta there." The group then discussed whether CS-8 could provide a vehicle to DAVIS, PROCTOR, THORNTON, and JOHNSON. The group also discussed the fact that the price of cocaine in Baltimore City was currently high, making the robbery especially lucractive. CS-8 told the group, ("coke price high and everything, but a better price is free [cocaine obtained through commission of a robbery]...especially when you're hungry [have no money and need drugs to sell to make money].") CS-8 further explained that his cocaine source typically met him at a hotel in Baltimore City and once he (CS-8) learned the location of the meeting, the group could commit the robbery. CS-8 explained that he (CS-8) could leave the door to the hotel room open as he entered and the robbery team could enter the room behind him. CS-8 informed the group that the cocaine source was not violent and that only a few "ratchets

[guns]" were needed because "once you [the TARGET SUBJECTS] stick it [a gun] in his [the source's] face" the source would likely surrender the drugs. At the conclusion of the meeting, the TARGET SUBJECTS expressed interest in committing the robbery. Throughout the meeting DAVIS, PROCTOR, THORNTON and JOHNSON were all attentive and participating in the conversation.

10.   On December 17, 2012, JOHNSON contacted CS-8 via cellular telephone. During this recorded conversation JOHNSON asked CS-8 if he could provide a vehicle for the TARGET SUBJECTS. CS-8 explained to JOHNSON, "The ride is good." CS-8 continued by explaining that the source of supple of narcotics would be coming to Baltimore in a few days and would be staying for a few weeks. CS-8 explained that because the source of supply was staying for an extended period of time, "He coming heavy [going to have a lot of drugs]…at least 10 jaunts [kilograms]; a five/five split [CS-8 would split the stolen cocaine evenly with the TARGET SUBJECTS]." JOHNSON then asked CS-8 if he had any other sources of supply because he (JOHNSON) did not have any other sources "to go to." CS-8 explained that the source of supply had recently cheated him (CS-8) in a drug transaction ("supposed to be a key [kilogram] and the shit was like a 7 and a half [750 grams]…but he charged me top dollar….nearly 40 [$40,000] a jaunt [kilogram].") CS-8 then asked JOHNSON, "if everyone [all of the TARGET SUBJECTS] was 'on point' [ready, willing and able to commit the robbery]." CS-8 continued that sometimes, "people say they want it, but they really don't want it [not willing to commit the crime]." JOHNSON responded that "this shit right here [a robbery of a drug trafficker] make my day…this my line of work [robbing drug dealers]…that's why I'm pretty sure he pulled in the niggers he pulled in [the TARGET SUBJECTS]." JOHNSON explained that he (JOHNSON) could not speak for the other TARGET SUBJECTS but that he

was "with that [the robbery] a 100 [100%] committed." The conversation concluded with CS-8 telling JOHNSON to talk to the other TARGET SUBJECTS and make sure they were ready to commit the robbery. CS-8 added that all they (the TARGET SUBJECTS) needed was "a couple of jaunts [guns]" and CS-8 would take care of providing a car.

11. On December 19, 2012, at the direction of law enforcement CS-8 met with DAVIS, PROCTOR and THORNTON in Baltimore City. This meeting was audio recorded and surveilled by investigators.

12. During the meeting, CS-8 told the group that his (CS-8's) source of supply of narcotics would be travelling to Baltimore the next day and that the planned robbery could proceed. CS-8 told the group that they would split the stolen cocaine (half to CS-8, half to the TARGET SUBJECTS) and that he (CS-8) planned to convert his powder cocaine into cocaine base (crack cocaine). THORNTON responded, "yeah, take that shit straight to the block [sell it on the streets of Baltimore]". CS-8 continued, saying "I'm cooking my shit up [converting the powder cocaine to crack]...that's the only way to make money." CS-8 then told the group, "make sure everybody ready to dance [ready to commit the robbery]." THORNTON responded, "Everybody down [ready to commit the robbery]." Later in the conversation THORNTON asked if the source of supply would be armed, to which CS-8 said he did not know, but that he would meet with the source and determine how many people and how much cocaine was at the location. THORNTON responded, "Yeah." Later in the conversation CS-8 asked the group if they had any hesitation in committing the robbery, to which PROCTOR responded, "My family has to eat." Later in the conversation, DAVIS asked, "What, he [the source of supply] gonna be in a hotel?" CS-8 responded that he had once met the source in a house. DAVIS then asked, "he got a lot of people [associates] down here [in Baltimore]?" CS-8 answered, "It ain't like you

6

B 12 4883 BPG thru B 12 4887 BPG

gonna bump into him." Soon after, CS-8 concluded the meeting by telling the group that he wanted to make sure that everyone in the group was going to answer their phones the next day (the day of the proposed robbery). Throughout the meeting, PROCTOR, DAVIS and THORNTON were all listening attentively and participating in the conversation.

13. On December 20, 2012, the TARGET SUBJECTS were provided a car which had previously been wired for video surveillance. The recorded video from inside the vehicle shows that PROCTOR, DAVIS, THORNTON, JOHNSON and JAZMEN TRUSTY (who had not previously met with or spoken to CS-8) entered the car. The TARGET SUBJECTS then drove the car to a prearranged location and met with CS-8. During that meeting, which was video and audio recorded, CS-8 told the TARGET SUBJECTS that he (CS-8) planned to call the source of supply from the parking lot of a nearby hotel. The source would then meet CS-8 and take him to the hotel room where the cocaine was being stored. CS-8 explained that he would send a text message to the TARGET SUBJECTS identifying the hotel room number and that after that point, "everything going to be a go [the robbery could proceed]." DAVIS, who was driving the car, asked CS-8 for more detailed directions to the parking lot where CS-8 planned to meet the source. After providing directions, CS-8 asked the TARGET SUBJECTS, "everybody still cool with the split, five five [evenly splitting the 10 kilograms of cocaine]. DAVIS answered, "Yeah." CS-8 then returned to his car and left the area. The video recording of the interior of the TARGET SUBJECTS' car shows that (at least) DAVIS and TRUSTY (who are both fully visible) are listening attentively to CS-8. Neither appears surprised or concerned by the conversation. At no time during or after the conversation did any of the TARGET SUBJECTS attempt to exit the car.

12 4883 BPG thru  12 4887 BPG

14.   As the TARGET SUBJECTS then drove their car towards the target location, the vehicle was disabled, an arrest team approached and all five of the TARGET SUBJECTS were quickly taken into custody. A search of JOHNSON yielded a pair of latex gloves, a ski mask and a black hat. A search of DAVIS yielded a latex glove, two black gloves and a black mask. A search of PROCTOR yielded a black stocking cap and a loaded .22 caliber pistol. A search of TRUSTY yielded a black stocking cap and a black hat.

15.   The TARGET SUBJECTS were subsequently *Mirandized* and all acknowledged their rights. TRUSTY, DAVIS, and JOHNSON subsequently agreed to be interviewed. TRUSTY, DAVIS, and JOHNSON each independently admitted that they planned to participate in a robbery of 10 kilograms of cocaine and that they understood that firearms would be used to facilitate the robbery.

16.   Based on my training knowledge and experience, I know that cocaine on the streets of Baltimore is typically sold to retail customers in 1/10 of a gram increments and that 10 to 12 kilograms of cocaine (the amount the co-conspirators intended to steal from the notional stash house) is unquestionably a distribution quantity of narcotics. Based on the most recent intelligence available to your Affiant, I know that the wholesale price of a kilogram of cocaine in Baltimore City is currently $40,000 and so 10 kilograms of stolen cocaine would have a resale value of approximately $400,000. Given these facts, I believe that the Target Subjects intended to steal the 10 kilograms of cocaine in order to resell it in Baltimore City.

17.   Your Affiant also knows, based on his training and experience that in Baltimore City, teams of drug traffickers often rob competing drug traffickers of their drugs in order to gain a ready supply of narcotics that can then be re-sold. Your Affiant also knows that these

robberies are typically accomplished by force, usually with firearms and sometimes resulting in violent encounters that result in the death or serious injury of the occupants.

18. To the best of my knowledge and belief, all statements made in this affidavit are true and correct. Based on the evidence provided, your Affiant believes that the Target Subjects intended to use the firearm pursuant to the arrest of the TARGET SUBJECTS to rob a notional drug trafficker of 10 kilograms of cocaine and then re-sell the stolen cocaine to customers in Baltimore City. Accordingly, based on the foregoing facts, I believe probable cause exists to support the issuance of a Criminal Complaint charging JOHNSON, PROCTOR, DAVIS, THORNTON and TRUSTY with; (1) conspiring with each other to knowingly and intentionally possesses with intent to distribute five kilograms, or more, of cocaine, in violation of Title 21 U.S.C. Section 846; and (2) conspiring to possess a firearm in furtherance of a drug trafficking crime which may be prosecuted in a court of the United States, that is, possession with intent to distribute 5 kilograms, or more, of cocaine, in violation of Title 18 U.S.C. 924(o).

Craig Jester
Task Force Officer, DEA

Sworn to and subscribed before me this 21st day of December, 2012.

Honorable Beth P. Gesner
United States Magistrate Judge